UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NOROTOS, INC.,<br><br>       Plaintiff,<br><br>vs.<br><br>OPS-CORE, INC.,<br><br>       Defendant.<br><br>AND RELATED COUNTERCLAIM. | Case No. 1:09-CV-10215-NG<br><br>Hon. Nancy Gertner |

## **OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND SANCTIONS**

      Infringement in this case turns on claim interpretation. When the claims are properly interpreted, Ops-Core's motion for summary judgment should be denied and Norotos's co-pending motion for summary judgment that Ops-Core has infringed at least claim 22 of the '810 Patent should be granted.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................................1

II. STATEMENT OF FACTS ....................................................................................................2

III. SUMMARY OF ARGUMENT .............................................................................................5

IV. ARGUMENT..........................................................................................................................6

    A.    The Claim Terms at Issue are Properly Interpreted to Cover an Assembly of the Recited Elements ............................................................................6

        1.    "Shroud plate" ...................................................................................7

        2.    "Insert" ................................................................................................9

        3.    "Smooth with rounded edges and corners at the periphery".......11

    B.    Once Properly Interpreted, the Disputed Claim Language Literally Reads on the VAS Shroud as Used in its Intended Assembly............................................12

    C.    At the Very Least, the VAS Shroud as Used in its Intended Assembly Infringes Under the Doctrine of Equivalents ..........................................................13

    D.    Ops-Core and Others Are Direct Infringers...............................................14

    E.    Ops-Core Contributes to and Induces Infringement .............................14

    F.    Sanctions on Norotos are Not Appropriate..........................................................15

V. CONCLUSION.....................................................................................................................16

## **TABLE OF AUTHORITIES**

**Page(s)**

### **CASES**

*Bicon, Inc. v. Straumann Co.*,
    356 F. Supp. 2d 6 (D. Mass. 2005) ........................................................................... 15

*Corning Glass Works v. Sumitomo Electric U.S.A., Inc.*,
    868 F.2d 1251 (Fed. Cir. 1989) ................................................................................ 13

*E.I Du Pont de Nemoours & Co. v. Phillips Petroleum Co.*,
    849 F.2d 1430 (Fed. Cir 1988) .................................................................................. 6

*MGM Studios, Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) ................................................................................................. 15

*Newriver, Inc. v. Newkirk Products*,
    674 F. Supp. 2d 320 (D. Mass. 2009) ...................................................................... 14

*Ricoh Co., Ltd. v. Quanta Computer, Inc.*,
    550 F.3d 1325 (Fed. Cir. 2008) ................................................................................ 15

*Sanitary Refrigerator Co. v. Winters*,
    280 U.S. 30 (1929) ................................................................................................... 13

*Snuba International, Inc. v. Dolphin World, Inc.*,
    2000 U.S. App. LEXIS 16946 (Fed. Cir. 2000) ....................................................... 14

*Tate Access Floors v. Interface Architectural Resources*,
    279 F.3d 1357 (Fed. Cir. 2002) ................................................................................ 12

*Texas Digital System, Inc. v. Telegenix, Inc.*,
    308 F.3d 1193 (Fed. Cir. 2002) .................................................................................. 5

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) .................................................................................... 6

## STATUTES

35 U.S.C. §102(b) ...................................................................................................7, 9, 11

35 U.S.C. § 271(a) ..............................................................................................................14

F.R.C.P. 11(b)(2) ................................................................................................................15

F.R.C.P. 11(c)(2)................................................................................................................15

**I.      INTRODUCTION**

Any patent infringement analysis must start with claim interpretation. Ops-Core asserts that the language in the asserted claims "[a] shroud plate for headgear comprising a shell, an insert, a lock and a release mechanism" requires that the four elements, and in particular the lock and the release mechanism "be located on the shroud plate itself, not on an attached device." *See* Ops-Core Memorandum[1] at page 12. However, Ops-Core offers no explanation or support for this particular claim interpretation. Moreover, Ops-Core fails to tell the Court that it asserted the exact opposite interpretation of this same claim language in its successful effort to have the patents-in-suit reexamined.

In its requests for reexamination, Ops-Core asserted:

> In the case of the '810 patent the latch and release button are on the female element, whereas they are on the male element in the US HMA OPERATOR'S MANUAL. Such placement of the latch and the release does not militate against anticipation since once the male and female portions are engaged, the latch and release effectively become part of the claimed shroud plate, i.e., they form an assembly which includes all of the elements of claim 1.

Request for Reexamination at page 7 (Declaration of Daly[2], Ex. F).

The U.S. Patent and Trademark Office ("PTO") accepted this interpretation, as did Norotos. The US HMA OPERATOR'S MANUAL was distinguished on other grounds.

Ops-Core presently attempts to adopt one claim interpretation to avoid infringement after asserting the opposite claim interpretation in its effort to invalidate the patents-in-suit. Ops-Core cannot have it both ways. Claim language is interpreted as a matter of law and that interpretation

---

[1]  Ops-Core's Memorandum in Support of Defendant Ops-Core, Inc.'s Motion for Summary Judgment and for Sanctions ("Ops-Core Memorandum").

[2] Factual support for this opposition brief is found in a number of declarations filed in this matter in support of Norotos's motion for summary judgment, such as Declaration of Thomas J. Daly in Support of Plaintiff Norotos, Inc.'s Motion for Summary Adjudication of Infringement of United States Patent 6,751,810. These declarations are cited herein as "Declaration of _____."

must be consistent in determining both infringement and validity. Norotos has consistently asserted that the claim language at issue is broad enough to cover an assembly of attached elements and does not require a unitary structure. Such an interpretation is consistent with the claim language itself, the specification of the patents, and the way the PTO interpreted the claims during reexamination.

The correct claim interpretation compels a determination that Ops-Core infringes at least claim 22 of the '810 Patent. Thus, Ops-Core's motion should be denied and that of Norotos be granted.

## II.     STATEMENT OF FACTS

Ops-Core's statement of the facts in this case is not so much inaccurate as it is incomplete.

Ops-Core stresses that it asserted a claim interpretation requiring a unitary structure for the shroud plate in its letters to Norotos at the beginning of this dispute. *See* Ops-Core Memorandum at pgs. 5-6. Ops-Core asserts the same claim interpretation in its present motion. *Id.* at page 12. However, Ops-Core fails to inform the Court that it took the exact opposite position on interpretation of the same claim language in its request for reexamination filed with the PTO. It told the PTO that engagement of the portions of a shroud plate and a lock plate effectively makes elements of the lock plate part of the shroud plate such that they form an assembly that would be covered by the language at issue herein. *See* Request for Reexamination at page 7 (Declaration of Daly, Ex. F).

Moreover, Ops-Core fails to tell the Court that the PTO adopted the claim interpretation it asserted, *see* Order Granting Reexamination at pgs. 4-5 (Declaration of Daly, Ex. G), and that Norotos did not contest this interpretation but, rather, was able to establish patentability of the Norotos inventions by distinguishing the prior art cited by Ops-Core on other grounds, *see* Notice of Intent to Issue Reexamination Certificate at page 2 (Declaration of Daly, Ex. M). Thus, Norotos has asserted a consistent interpretation for this claim language throughout. *Compare*  November 20, 2008 Letter to Mr. Rogers of Ops-Core (Declaration of Daly, Ex. C)

*with* Plaintiff's Disclosure of Asserted Claims and Preliminary Infringement Contentions at page 1. Norotos has always insisted that this claim language is broad enough to cover assembled elements as well as a unitary structure. *Id.* The PTO agreed with the Norotos interpretation (Declaration of Daly, Ex. G) as did Ops-Core when it suited its purpose in the context of its request for reexamination. (Declaration of Daly, Ex. F)

Ops-Core also asserts that it has not made or sold the mounts with which its VAS Shrouds are intended to be used. *See* Ops-Core Memorandum at page 5. However, although Ops-Core attaches to its motion many of the letters exchanged between Ops-Core and Norotos regarding the present dispute, it does not include the first letter its Vice President, Mr. Rogers, sent to Norotos. In that letter, dated November 1, 2008, Mr. Rogers states: "We are currently in the process of launching two new helmet models which all utilize these VAS Shroud mount products. . . ." Declaration of Soto at ¶ 5, Ex. A at page 1. He later adds: "[W]e purchased (at list price) several of your AKAZ mounts and provided them to operators in theater with our helmets." *Id.*, Ex. A. pg. 3. Thus, Ops-Core has admitted that it has distributed to several of its customers the assembly accused of infringement.

Moreover, Ops-Core's brief in support of its motion suggests that the VAS Shroud exists in a vacuum and that Ops-Core has little or nothing to do with how the VAS Shroud is used. *See* Ops-Core Memorandum at pgs. 4-5. Nothing could be further from the truth. As Mr. Rogers of Ops-Core states in a letter that Ops-Core did include with its motion, "Norotos, Inc. stands to receive a substantial amount of new sales and revenue from thousands of helmets and shrouds we are selling that only work with your mount products." Declaration of Rogers, Ex. C; Declaration of Soto, Ex. C. Thus, Ops-Core has admitted that its VAS Shroud products have no substantial use other than in the assembly accused of infringement.

Further, with regard to use of the VAS Shroud, Ops-Core has used its VAS Shroud product in the assembly accused of infringement at trade shows and in pictures shown in its press releases, on its website, on its packaging and in its catalogs. *See* Declaration of Prendergast at ¶¶ 9 and 10, Exs. C, D, E and F. Ops-Core's press releases, website, packaging and catalogs all

promote and show use of the VAS Shroud with a mount, an accused infringing assembly. *Id.* The packaging that Ops-Core uses with its VAS Shroud products explicitly instructs purchasers how to use the product in an assembly accused of infringement. *See* Declaration of Chavez at ¶ 5, Ex. D.

In particular, Ops-Core's brief at page 7 includes an illustration that Ops-Core obliquely describes as one "attached to Norotos's Infringement Contentions." What Ops-Core fails to note is that the illustration comes from Ops-Core's own packaging for the VAS Shroud product. *See* Declaration of Chavez, Ex. D.

Norotos has asserted that its patent claims cover the VAS Shroud product when it is used with a mount. Ops-Core has itself used this very assembly. *See* Declaration of Prendergast, Exs. E and F. It admits that it has distributed this combination to customers. *See* Declaration of Soto, Ex. A. Ops-Core admits and is well aware that the VAS Shroud has no other substantial use besides use in this assembly. *See* Declaration of Soto, Ex. C. Ops-Core encourages and instructs its customers on how to use the VAS Shroud in this assembly. *See, e.g.,* Declaration of Chavez at ¶ 5, Ex. D.



Ops-Core Press Release (Declaration of Prendergast, Ex. C)



Ops-Core Press Release (Declaration of Prendergast, Ex. C)



Ops-Core Catalog (Declaration of Prendergast, Ex. D)



Ops-Core Trade Show Demo (Declaration of Prendergast, Ex. F)



Ops-Core Packaging (Declaration of Chavez, Ex. D)



Ops-Core Packaging (Declaration of Chavez, Ex. D)

### III. SUMMARY OF ARGUMENT

The claim language "[a] shroud plate for headgear comprising a shell, an insert, a lock and a release mechanism" in the claims at issue in this case should be interpreted as covering an assembly of the four elements attached together and does not require that they be in a unitary structure. Such an interpretation is consistent with the claim language itself, the specification of the patents, and the way the PTO interpreted the claims during reexamination. The Federal Circuit has stated that claim terms should be given the full range of their ordinary meaning as understood by persons skilled in the relevant art. *See Texas Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1202 (Fed. Cir. 2002) (citation omitted). The prior art cited during the reexamination and the PTO's adoption of a claim interpretation that covered a shell and an insert in a helmet mounting bracket that received a mount containing a lock and a release mechanism shows that persons of ordinary skill in the art would understand that these claimed elements could be assembled in separate parts. This is entirely logical because the lock and release mechanism only serve a useful purpose when combined with the shell and the insert. In such a combination, they releasably hold a mount in place. When separated from the shell and the insert, they serve no purpose.

Properly interpreted, the claims at issue are infringed by the VAS Shroud used for its intended purpose with a mount lock plate incorporating a lock and release mechanism attached thereto. In this assembly, the shroud plate, i.e., the interface between the headgear and the mount, does comprise a shell, an insert, a lock and a release mechanism. Thus, this assembly literally infringes the claims at issue in this case.

Even if the noted claim language is determined to be directed at a device incorporating each of the four recited elements, moving two of the four elements to a part that is intended to be received by the part containing the other two elements should be considered an equivalent. It is an insubstantial difference. The four elements still function in the same way to achieve the same result. The lock and release mechanism only have a useful function when joined with the other two elements.

Ops-Core is itself a direct infringer of the claims at issue. It uses the infringing assembly at trade shows and in numerous other contexts to promote the sale of its VAS Shroud product. Moreover, it admits that it has supplied the infringing assembly to several customers. Ops-Core's promotional materials shows the use of the infringing assembly by others. This is proof of direct infringement.

Ops-Core has also admitted that the VAS Shroud product that it makes and sells has no substantial use other than in the infringing assembly. Ops-Core is therefore a contributory infringer. Moreover, Ops-Core encourages and instructs its customers to use the VAS Shroud in an infringing assembly on its website, in its catalog, and on the packaging for the VAS Shroud. Consequently, Ops-Core is inducing infringement.

The claim interpretation asserted by Norotos is the same as that asserted by Ops-Core in requesting reexamination and is the same as that adopted by the PTO in the reexaminations. In view thereof, asserting such a claim interpretation in this action cannot be sanctionable, especially when it is the correct claim interpretation. Nothing in such conduct would make this an exceptional case. Nothing in such conduct could implicate Rule 11. Further, Ops-Core has failed to comply with the procedural requirements necessary to pursue sanctions under Rule 11.

## IV. ARGUMENT

### A. The Claim Terms at Issue are Properly Interpreted to Cover an Assembly of the Recited Elements

"It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). In the present case, the patent itself and the prosecution history, including reexamination proceedings, support the meaning and scope of the identified claim terms asserted by Norotos. *See E.I Du Pont de Nemoours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1439 (Fed. Cir 1988) (indicating that statements made during the reexamination proceeding of a patent are relevant prosecution history when interpreting claims).

### 1. "Shroud plate"

Claim 22 recites "[a] shroud plate for headgear comprising a shell, an insert a lock and a release mechanism." Based upon this language itself, the specification and the prosecution history, "shroud plate" should be interpreted to encompass either a structure that is integrated as a single piece ("monolithic piece") or as a structure that is assembled together from two or more separable pieces ("assembled piece").

The claim language merely recites the four elements that make up a "shroud plate." Nothing about the language compels a reading that excludes these elements being assembled from separate parts to form the "shroud plate."

The specification indicates that the invention of the '810 Patent relates to "a shroud plate which may act as an <u>interface</u> between a helmet and the helmet mount for a night vision device." '810 Patent at col. 1, lines 7-9, emphasis added, (Declaration of Daly, Ex. A). Additionally, the specification provides that "the shroud plate of the present invention allows a helmet mount for a night vision device to be easily attached and removed from a helmet." '810 Patent at col. 1, lines 61-63 (*Id.*) Neither the claim nor the specification preclude the shroud plate from being either a monolithic piece or an assembled piece.

Further, during reexamination proceedings, Ops-Core[3] indicated that "claims 1, 2, 8, and 11-13 of the '810 patent are considered to be unpatentable under 35 U.S.C. §102(b) because they are anticipated by the printed publication entitled 'Operator's Manual Night Vision Goggles AN/PVS-7B (NSN 5855-01-228-0937) (EIC: IPS) and AN/PVS-7D (NSN 5855-01-422-5413) (EIC: N/A)' and published by the United States Departments of the Army, the Navy and the Air Force and Headquarters, Marine Corps on December 1, 1997 ["US HMA Operator's Manual"]." Request for Reexamination for U.S. Pat. No. 6,751,810, submitted June 10, 2009 ("Request for Reexamination" at page 2 (Declaration of Daly, Ex. F)). At the time that Ops-Core filed its

---

[3] Ops-Core acknowledged that it filed for an *ex parte* reexamination of the '810 patent. See Ops-Core's Memorandum in Support of Defendant Ops-Core's Motion for Summary Judgment and for Sanctions, at page 6. Such reexamination proceedings are a part of the prosecution history of the '810 Patent and are relevant to claim interpretation.

Request for Reexamination, claim 1 contained the same language cited above with respect to the shroud plate.[4]

To support its position, Ops-Core included Figures 2-22 and 2-23 of the US HMA Operator's Manual, both of which are provided below for convenience.



Figure 2-23. Installation of Helmet Mount.   Figure 2-22. Helmet Mount Assembly.

As can be seen in the figures reproduced above, the helmet mount assembly includes a "helmet mounting bracket" and a "mount" separable from the helmet mounting bracket, wherein the mount can be coupled to the helmet mounting bracket to form an assembled piece. In its Request for Reexamination, Ops-Core argued that claim 1 is anticipated by the US HMA Operator's Manual because the US HMA Operator's Manual discloses "[a] mount 36 [including] a lock (latch) 38 and release mechanism (button) 40. *See* Figs. 2-22 and 2-23." Request for Reexamination at page 3, claim chart, (Declaration of Daly, Ex. F).

Ops-Core further noted that "[a] removable element, such as Night Vision Goggles, includes a male portion which matches a female portion mounted on the helmet. . . . In the case of the '810 patent the latch and release button are on the female element, whereas they are on the male element in the US HMA OPERATOR'S MANUAL. Such placement of the latch and the release does not militate against anticipation since once the male and female portions are engaged, the latch and release <u>effectively become part of the claimed shroud plate</u>, i.e., they form

---

[4] In an Amendment filed on November 18, 2009, Norotos added, among others, claim 22. Except as noted otherwise herein, the language of claim 22 under interpretation is identical to the language of claim 1 and should be interpreted identically for both claims.

an assembly which includes all of the elements of claim 1." Request for Reexamination at page 7, emphasis added, (*Id.*).

In an Office action in *Ex Parte* Reexamination dated September 18, 2009, the Examiner agreed with Ops-Core's position and rejected claims 1, 2 and 11-15 under 35 U.S.C. §102(b) as being anticipated by the US HMA Operator's Manual. September 18, 2009 Office action in *Ex Parte* Reexamination at page 2 (Declaration of Daly, Ex. H). In rejecting the claims, the Examiner indicated that the US HMA Operator's Manual discloses a shroud plate for head gear comprising "a lock (*see* 'latch' in fig. 2-23), and a release mechanism (*see* 'release button' in fig. 2-22)." *Id.* As noted above, both the "latch" and the "release button" in the cited reference are on the "mount" which is separate and separable from the "helmet mounting bracket." Accordingly, even though the latch and the release button are not on the same member as the shell and the insert, the Examiner agreed with Ops-Core that the latch and the release button effectively become part of the claimed shroud plate because they form an assembly that includes all of the elements of claim 1.

Norotos was ultimately able to overcome the anticipation rejection of claim 1, but did so without amending the language cited above and without otherwise limiting the shroud plate to be only a monolithic piece. Accordingly, "shroud plate" should be interpreted to encompass both an assembled piece and a monolithic piece.

### 2. "Insert"

Claim 22 recites "[a] shroud plate for headgear comprising a shell [and] an insert . . . wherein the insert is adapted to receive a lock plate." Claim 22 indicates the function of the insert, but it does not limit the structure of the insert. Accordingly, "insert" should be interpreted to encompass a portion of the shroud plate that "is adapted to receive a lock plate, "even if that portion is made from the same material as and is integral with the shell. This interpretation is also supported by the specification and the prosecution history.

The specification provides that:

> [t]he insert 16 is designed as a bay for a lock plate or adapter plate

> 17 . . . and functions as the interface between a helmet mount and a helmet 12. The shroud plate 10 may comprise an insert 16 that is integral with a shell 13 essentially making the plate one piece. The shroud plate 10 may comprise two integrally related pieces, the shell 13 and the insert 16, to optimize weight and durability. . . . However, it is also possible that the shroud plate 10 may be <u>one piece</u> made from <u>one material</u>, for example all nylon or all aluminum.

'810 Patent at col. 3, lines 17-29, emphasis added, (Declaration of Daly, Ex. A).

Clearly, the specification describes an "insert" as either (1) a structure that is a different material from the shell or (2) a structure that is the same material as and integral with the shell. As noted above, claim 22 does not specify a material from which the insert is made nor whether the insert is integral with or made separately from the shell. Accordingly, "insert" as claimed in claim 22 should be interpreted as encompassing both structures.

The prosecution history also supports the interpretation of "insert" which Norotos proposes. In advocating its position regarding anticipation of the claimed phrase "the insert is adapted to receive a lock plate" during reexamination, Ops-Core indicated that "[t]he US HMA OPERATOR'S MANUAL Mounting Bracket 30 includes a recessed area formed by keepers 34 and 35 which are sized and shaped to receive lock plate 48 of mount 36. *See* Figs. 2-22 and 2-23." Request for Reexamination at page 4, claim chart, (Declaration of Daly, Ex. F). Further, Ops-Core stated that "[t]he [U.S.] HMA [Operator's Manual] includes a Bracket which <u>integrates the shell and insert</u>, and a Mount for the Night Vision Goggles which includes a lock and release mechanism. The Helmet Mounting Bracket has a recessed area defined by Keepers sized and shaped to receive the Mount" and "[i]n the US Helmet Mounting Assembly, the shell and insert are <u>integrated as one piece made from one material</u> and are collectively referred to as the Helmet Mounting Bracket." Request for Reexamination at pages 5-6, emphasis added, (*Id.*).

As noted above, the Examiner agreed with Ops-Core's position and rejected claims 1, 2

and 11-15 under 35 U.S.C. §102(b) as being anticipated by the US HMA Operator's Manual. September 18, 2009 Office action in *Ex Parte* Reexamination at page 2 (Declaration of Daly, Ex. H). More specifically, the Examiner indicated that the US HMA Operator's Manual discloses a shroud plate for head gear comprising "an insert (*see* a square portion "keeper" in figs. 2-22 and 2-23) . . . the insert [being] adapted to receive a lock plate." September 18, 2009 Office action in *Ex Parte* Reexamination at page 2 (*Id.*).

Again, Norotos was able to overcome the anticipation rejection, but did so without amending the language above or otherwise limiting the insert to being a different material from the shell. Accordingly, Ops-Core's position during reexamination and the Examiner's subsequent agreement with Ops-Core's position further supports interpreting "insert" as being broad enough to cover a lock plate receiving portion that is integral with and made from the same material as the shell of the shroud plate.

### 3. "Smooth with rounded edges and corners at the periphery"

Claim 22 recites "wherein the external surface [of the shell] is smooth with rounded edges and corners at the periphery, such that the shell has no projections on which a shroud line may catch."

The specification provides that "previous helmet attachment mechanisms have comprised sharp edges and/or hooked shaped portions which may interfere with or even seriously injure a user. For instance, a hook portion may catch the shroud line of an opening parachute, cutting the line or violently jerking the user's head and neck." '810 Patent at col. 1, lines 39-44 (Declaration of Daly, Ex. A). The specification further provides that "the top surface of the shell 13 may be smooth with rounded edges and corners. Fitting the shell 13 to the shape of the helmet 12 and having a smooth surface with rounded edges and corners on the shell 13 ensures that there are no unnecessary edges on which another object, such as a shroud line of a parachute or a dangling tree branch in heavy foliage, may catch." '810 Patent at col. 3, lines 2-8 (*Id.*).

In response to an Office action in *Ex Parte* Reexamination, dated March 8, 2010, Norotos added claim 22 which, as noted above, is substantially similar to claim 1, but added the

following relevant language (added language is underlined): "wherein the external surface [of the shell] is smooth with rounded edges and corners at the periphery, <u>such that the shell has no projections on which a shroud line may catch</u>."  *See* Declaration of Daly, Ex. L.

In a Notice of Intent to Issue *Ex Parte* Reexamination Certificate dated May 5, 2010, the Examiner agreed that claim 22 was allowable over the US HMA Operator's Manual because "the US HMA [Operator's Manual] fails to disclose an external surface of the shell [being] smooth with rounded edges and corners at the periphery, such that the shell has no projections on which a shroud line may catch because the shroud plate of US HMA [Operator's Manual] has projections, such as the 'keepers' projecting from a side edge of the shroud plate."  Notice of Intent to Issue *Ex Parte* Reexamination Certificate at page 2 (Declaration of Daly, Ex. M).

Accordingly, "smooth with rounded edges and corners at the periphery" should be interpreted in accordance with the ordinary meaning of the claim language, i.e., that the external surface of the shell has no projections on which a shroud line may catch.

**B.      Once Properly Interpreted, the Disputed Claim Language Literally Reads on the VAS Shroud as Used in its Intended Assembly**

The VAS Shroud product made and sold by Ops-Core has a shell with an internal portion that is adapted to receive a lock plate.  Thus, it does have an "insert."  Ops-Core attaches mounts to its VAS Shroud product to demonstrate the resulting assembly at trade shows and to promote its VAS Shroud product on its website, in its catalog and on its packaging.  The compatible mount has a lock plate that is received into the "insert" of the VAS Shroud.  The lock plate also includes a lock and a release mechanism.  Thus, the assembly used by Ops-Core and by others as shown in Ops-Core's promotional materials has the four elements recited in the contested claim language used in an interface between a headgear and a mount, i.e., in a "shroud plate."  Accordingly, Ops-Core and others use an assembly that literally infringes.  *See Tate Access Floors v. Interface Architectural Res.,* 279 F.3d 1357, 1366 (Fed. Cir. 2002).

### C. At the Very Least, the VAS Shroud as Used in its Intended Assembly Infringes Under the Doctrine of Equivalents

Norotos believes that the claims at issue should be interpreted to literally cover "shroud plates" that are both unitary and assemblies. However, should the claims be interpreted as being directed to "shroud plates" where the elements are incorporated into a single device, the claim language and the patent specifications do not intentionally exclude the possibility of an assembly of the recited elements. That is, there is nothing in the claim language or the patent specifications that could be read as disclaiming an assembly of the recited elements. Accordingly, this claim language can be considered under the doctrine of equivalents.

The claims expressly recognize that the "insert is adapted to receive a lock plate." Moreover, the claims also expressly recognize that the "lock" element "is adapted to secure the lock plate to the insert," and that the "release mechanism" element "allows for removal of the lock plate from the insert." Accordingly, the claim language clearly anticipates engagement between the insert and the lock plate.

Whether the "lock" and "release mechanism" elements are located with the "insert" or located with the "lock plate" makes no difference in the engagement. The lock and release mechanism will still operate to secure the lock plate to the insert and to allow it to be removed. Merely moving these elements from one half of the engagement to the other half is an insubstantial difference, and should not result in an avoidance of infringement. *See Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 41-42 (1929) ("A close copy which seeks to use the substance of the invention, and, although showing some change in form and position, uses substantially the same devices, performing precisely the same offices with no change in principle, constitutes an infringement.") *See also, Corning Glass Works v. Sumitomo Electric U.S.A., Inc.,* 868 F.2d 1251, 1259 (Fed. Cir. 1989) ("An equivalent must be found for every limitation of the claim somewhere in an accused device, but not necessarily in a corresponding component. . ..). Thus, if Ops-Core does not literally infringe, it should be found to infringe under the doctrine of equivalents.

### D. Ops-Core and Others Are Direct Infringers

Ops-Core asserts that it does not make or sell mounts and, therefore, does not make or sell the infringing assembly. However, making and selling an infringing product are not the only acts that can constitute infringement. Use of an infringing product is also an act of direct infringement. 35 U.S.C. § 271(a). Extensive evidence is present in this case that Ops-Core itself and others, as shown in Ops-Core's promotional materials, use the infringing assembly. Ops-Core has used it at trade shows and has used it and shown its use by others in numerous promotional materials. *See Newriver, Inc. v. Newkirk Prods.,* 674 F. Supp. 2d 320, 328 (D. Mass. 2009) (*citing, Snuba Int'l, Inc. v. Dolphin World, Inc.,* 2000 U.S. App. LEXIS 16946, 15-16 (Fed. Cir. 2000) (unpublished) (circumstantial evidence from defendant's own promotional materials sufficient to prove direct infringement)). Thus, Ops-Core and others are direct infringers.

### E. Ops-Core Contributes to and Induces Infringement

Ops-Core asserts that Norotos has not proven that the VAS Shroud has no substantial non-infringing use. Yet, the Vice President of Ops-Core, Mr. Rogers, has stated that the VAS Shroud will "only work" with the Norotos mount products, which would be an infringing assembly. Declaration of Soto, Ex. C.

Moreover, in the press release introducing the VAS Shroud product, Ops-Core stated: "The standard . . . Mount Arm . . . clicks into the VAS just like does the other issue mounts. Its inserted and anchored underneath the top of the bracket and pushed down to snap into place while pressing the adapter's release trigger." Declaration of Prendergast, Ex. C. No other end use for the VAS Shroud is described. Similarly, on the packaging for the VAS Shroud product, the use of the product is described, including: "STEP 3: ATTACH NVD ADAPTOR Insert and anchor the top of the NVD adaptor underneath the top of the bracket as shown. While pressing the adapter's release trigger, push down to snap and lock the adapter in place." Declaration of Chavez at ¶ 5, Ex. D. No other end use for the VAS Shroud is described on its packaging. Thus, the evidence is overwhelming that the VAS Shroud has no substantial use other than in an

infringing assembly. Accordingly, Ops-Core contributes to infringement. *See, Ricoh Co., Ltd. v. Quanta Computer, Inc.,* 550 F.3d 1325, 1338 (Fed. Cir. 2008).

As described above, Ops-Core instructs its customers for the VAS Shroud product to use that product in an infringing assembly. It also encourages customers to adopt an infringing assembly. In the press release introducing the VAS Shroud product, Ops-Core states: "If you have a [night vision device], and use the Standard U.S. Army Mount Arm (#A3256368), do yourself a favour and ditch your old hook and strap helmet mount or single-hole MICH mount. The Ops-Core VAS Shroud is a must have upgrade . . ." Declaration of Prendergast, Ex. C. Thus, Ops-Core is encouraging use of the VAS Shroud in an infringing assembly. Ops-Core is inducing infringement. *See Ricoh* at 1341 (*citing MGM Studios, Inc. v. Grokster, Ltd.,* 545 U.S. 913 (2005)).

### F.     Sanctions on Norotos are Not Appropriate

Norotos has asserted a particular claim interpretation in this matter in good faith. For the reasons set forth at length above, Norotos believes that it is the correct claim interpretation. It is the same claim interpretation asserted by Ops-Core in the requests for reexamination, and it is the same claim interpretation adopted by the PTO. Assertion of such a claim interpretation, and assertion of the infringement that results therefrom, is not frivolous and cannot possibly give rise to sanctions. *See, e.g., Bicon, Inc. v. Straumann Co.,* 356 F. Supp. 2d 6, 8 (D. Mass. 2005). Such conduct cannot make this an exceptional case. *Id.* Norotos' legal contentions as to claim interpretation are warranted by existing law and, therefore, cannot give rise to sanctions under Rule 11. F.R.C.P. 11(b)(2).

Moreover, Ops-Core has not complied with the procedural safeguards set forth in Rule 11 to be entitled to sanctions. Ops-Core has not made a separate motion for sanctions. *See* F.R.C.P. 11(c)(2). Also, Ops-Core did not serve the motion and then allow at least 21 days for withdrawal of the challenged paper before filing the motion with the Court. *Id.* Thus, even if Norotos had engaged in any conduct that might warrant sanctions, Ops-Core did not proceed properly to seek any sanctions under Rule 11.

## V. CONCLUSION

For the reasons set forth above, Ops-Core's motion for summary judgment and sanctions should be denied in its entirety. Instead, Norotos's cross motion for summary judgment that Ops-Core has infringed at least claim 22 of the '810 patent should be granted.

DATED: October 25, 2010                    Respectfully submitted,

By  /s/ *Edward R. Schwartz*
     Edward R. Schwartz, BBO #448050

**CHRISTIE, PARKER & HALE, LLP**
**350 West Colorado Blvd., Suite 500**
**Pasadena, California 91105**
**Telephone:    (626) 795-9900;**
**Facsimile:    (626) 577-8800**
**E-mail:**        *ers@cph.com*

*Attorneys for Plaintiff And Counterdefendant, NOROTOS, INC.*

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 25, 2010.

*/s/ Edward R. Schwartz*
Edward R. Schwartz

SES PAS924960.1-*-10/25/10 11:38 AM