# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **NOROTOS, INC.,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 09cv10215-NG** |
| ) | |
| **OPS-CORE, INC.,** ) | |
| **Defendant.** ) | |

**GERTNER, D.J.**

### MEMORANDUM AND ORDER RE: MOTIONS FOR SUMMARY JUDGMENT
#### July 25, 2011

Both plaintiff Norotos, Inc. ("Norotos") and defendant Ops-Core, Inc. ("Ops-Core")

manufacture shroud plates. These were devices primarily used in military and commercial

settings for securing night vision goggles and binoculars to helmets, thereby freeing the user's

hands. Ops-Core calls its product the "VAS Shroud." Norotos does not have a specific name for

its product. Norotos claims that Ops-Core's shroud plate infringes United States Patent No.

6,751,810 ("'810 Patent"), Norotos' patent for its version of the shroud plate.[1]

The two products are essentially the same except for one key difference. First, both

comprise a shell with rounded edges and corners that is contoured to fit onto a helmet. Second,

they both require a corresponding mount arm to attach the night vision goggles or binoculars to

the shell. Finally, they both have an insert area into which a mount arm snaps through a lock and

release mechanism. Norotos' device, however, has the lock and the release mechanism

embedded within its insert area, while the VAS Shroud relies upon the connecting end of the

mount arm to provide the lock and release mechanism. Ops-Core displays its VAS Shroud with

---

[1] Norotos also asserted infringement of US Patent No. 6,938,276 (filed Sept. 6, 2005) by Ops-Core in its
Complaint. Compl. for Patent Infringement (document #31). However, in the cross motions for summary judgment,
only Claim 22 of the '810 patent is at issue.

a mount arm in its promotional materials and at trade shows; however, Ops-Core does not sell or manufacture mount arms.

The parties have filed cross-motions for summary judgment. Ops-Core seeks a declaration that the VAS Shroud does not infringe the '810 patent, since it does not include all the claim limitations, namely a lock and a release mechanism. Norotos counters that the VAS Shroud infringes both literally and by application of the doctrine of equivalents when considered in its fully "assembled" form with the necessary mount arm. Accordingly, Norotos seeks partial summary judgment that the VAS Shroud infringes at least one claim, Claim 22, of the '810 Patent.

For the reasons described below, I find that the VAS Shroud does literally infringe Claim 22 of the '810 patent. Therefore, Norotos' Motion for Partial Summary Judgment (**document #39**) is **GRANTED**, and Ops-Core's Motion for Summary Judgment (**document #34**) is **DENIED**.

I.    **BACKGROUND**

A.    **The Prior Art - The Helmet Mounting Bracket**

Before Norotos or Ops-Core developed its shroud plate, the military used, among other things, a mounting bracket to attach headgear to a helmet. Prendergast Decl. ¶¶ 2-3 (document #45). This mechanism attached to a helmet by hooking the bracket's legs underneath the front brim of the helmet. Daly Decl. Ex. F, at 8. (document #42-6). The bracket was then secured to the helmet by a strap and/or a helmet screw. Prendergast Decl. ¶ 3. The helmet mounting bracket did not contain a lock or a release mechanism. In order to attach a night vision device to the helmet, the bracket had to be used in conjunction with a mount arm that contained a lock and

a release mechanism. Daly Decl. Ex. F, at 10. The helmet mounting bracket is illustrated in Figure 1 below.



Fig. 1

### B.    Norotos Receives the '810 Patent

In 2002, Jonathan R. Prendergast ("Prendergast") of Norotos developed the company's version of a shroud plate. Prendergast Decl. ¶¶ 3-4. On June 22, 2004, Norotos, as the patent assignee, was issued the '810 patent, which had 20 claims. U.S. Patent No. 6,751,810 (filed Mar. 13, 2003) (document #1-2). Prendergast claims that the purpose of his invention was to create an interface between a helmet and headgear, like night vision goggles, that was free of protruding edges on which another object, such as a shroud line of a parachute or a dangling tree branch, could catch. '810 Patent col.1 ll.59-67. Indeed, in the section of the patent entitled "Background of the Invention," Prendergast listed protruding edges, hooked-shaped portions, and the non-permanence of the attachment as deficiencies of the prior art, all of which could interfere with the user's safety when opening a parachute. Id. Prendergast also noted that paratroopers were placing tape over the mounting bracket before jumping to prevent any catching or accidental removal. Id. col. 1 ll.45-48. The disadvantage of covering the bracket with tape was that, once

the user landed, the tape would have to be removed from the helmet before the user was able to attach the night vision goggles or similar device.  Id. col. 1 ll.48-51.

Norotos makes and sells a shroud plate based on Prendergast's patented design, in which the insert and the lock and release mechanism are incorporated into a smooth, rounded shell designed to fit the contours of a helmet.  Prendergast Decl. ¶ 5.  The shroud plate can also stay permanently attached to a helmet by screws.  After landing, the user merely has to snap the mount arm, attached to the night vision device, into the shell's insert .  Prendergast Decl. ¶¶ 3-4.  To disengage the mount arm, the user simply presses the release button -- part of the lock of release mechanism -- located on the shell.  Prendergast Decl. ¶ 5.

An embodiment of the Norotos '810 patented device is illustrated in Figure 2 below.



Fig. 2

**C.      Ops-Core's VAS Shroud**

Prior to August 2008, Ops-Core began selling its VAS Shroud.  Prendergast Decl. ¶ 9. Like Norotos' device, the VAS Shroud is smooth with rounded edges and corners, is contoured to fit the shape of a helmet, contains an insert area, but does not contain a lock or a release mechanism for connecting the shell to the a mount arm.  Rogers Decl. ¶ 5, Ex. B (document #37).  Instead, the corresponding mount arm must contain a lock and release mechanism that

snaps into the insert area of the VAS Shroud.  Id.  Also, like Norotos' device, the VAS Shroud

can stay permanently attached to a helmet by screws, and, after landing, the user merely has to

snap the mount arm, attached to the night vision device, into the shell's insert.  Def. Ops-Core,

Inc.'s Statement of Undisputed Material Facts In Supp. of Mot. For Summ. J., 6 (document #36).

To disengage the mount arm, the user can simply press the release button on the mount arm.

Mem. in Supp. of Def. Ops-Core, Inc.'s Mot. for Summ. J. and Sanctions, 7 (document #35)

[hereinafter "Def. Mot. for Summ. J."].

An embodiment of Ops-Core's VAS Shroud is illustrated in Figure 3 below.



Fig. 3

Ops-Core does not manufacture or sell mount arms, however, it displays the VAS Shroud

with a mount arm in its promotional materials and at trade shows.  Rogers Decl. ¶ 7; Prendergast

Decl. ¶ 10,12.

**D.     Norotos Confronts Ops-Core**

In August 2008, Norotos learned of Ops-Core's VAS Shroud, which was offered in Ops-

Core's 2008 catalog and online on Ops-Core's website.  Prendergast Decl. ¶ 9.  Ronald Soto

("Soto"), the President of Norotos, sent a letter to Ops-Core on October 30, 2008, expressing

concern that the VAS Shroud contained "substantially the same features as claimed in Norotos' patent."  Soto Decl. ¶ 4. (document #44).

David Rogers ("Rogers"), Vice President of Ops-Core, responded to Soto in a letter dated November 1, 2008, asserting that the VAS Shroud did not infringe the '810 Patent because it did not contain "a lock and release mechanism."  Rogers Decl. ¶ 9.  Further negotiations between the parties proved futile, and Norotos filed its complaint against Ops-Core on February 12, 2009.  Compl. ¶ 8.

### E.   Ops-Core Requests *Ex Parte* Reexamination of Norotos' '810 Patent by the U.S. Patent and Trademark Office

On June 10, 2009, Ops-Core filed an *Ex Parte* Request for Reexamination ("Request for Reexamination") of all 20 claims of the '810 Patent with the U.S. Patent and Trademark Office ("PTO").  Daly Decl. Ex. F, at 1.  In its Request for Reexamination, Ops-Core argued that the prior art -- including, but not limited to, the helmet mounting bracket -- rendered Norotos' '810 Patent anticipated and obvious under 35 U.S.C. §§ 102-03.[2]  Daly Decl. Ex. F, at 4-5.  In support, Ops-Core referred to descriptions and pictures of the mounting bracket in a manual published by the United States military in 1997 ("military manual").[3]

A helmet mounting bracket attached to a helmet is illustrated in Figure 4 below.

---

[2] Under 35 U.S.C. § 102, a patent is challenged for "anticipation."  Pursuant to 35 U.S.C. § 103, a patent is challenged for "obviousness."

[3] The military manual is entitled Operator's Manual Night Vision Goggles AN/PVS-7B (NSN 5855-01-228-0937) (EIC: IPS) and AN/PVS-7D (NSN 5855-01-422-5413) (EIC: N/A), which was published by the United States Departments of the Army, the Navy and the Air Force and Headquarters, Marine Corps on December 1, 1997.



Fig. 4

Even though the helmet mounting bracket did not contain a lock and a release mechanism, Ops-Core argued that the PTO should consider the helmet mounting bracket in its assembled form with its corresponding mount arm.  Id. at 10.  Ops-Core claimed that once the helmet mounting bracket and mount arm were assembled together, the two pieces "effectively become part of the claimed shroud plate."  Id.  Accordingly, Ops-Core argued, by connecting a mount arm containing a lock (or "latch") and a release mechanism to the bracket, the bracket included all the essential elements of the '810 Patent design -- the shell, an insert, a lock and a release mechanism.  Id.

The PTO agreed to conduct the Reexamination of the '810 Patent.  On September 11, 2009, PTO Examiner Jimmy Nguyen ("Nguyen") rejected all 20 claims of the '810 Patent for anticipation or obviousness.  Daly Decl. Ex. H, at 3-11 (document #42-8).  In explaining his decision, Nguyen implicitly considered the mounting bracket in its assembled form.  Daly Decl. Ex. H, at 4.

**F.      Norotos Submits Amended Application for the '810 Patent**

In response to the rejection of all 20 claims of its '810 Patent, Norotos submitted an amended application ("Amendment") to the PTO on November 18, 2009, addressing the PTO's evaluation.  Daly Decl. Ex. J, at 3 (document #42-10).  The Amendment defended the original 20 claims; added new Claims 21-24, which Norotos said were designed to clarify and define terms; and articulated what Norotos believed were the traits of the '810 Patent that distinguished it from the prior art.  Daly Decl. Ex. J, at 3-17.

Claim 22 was specifically added in response to the PTO's rejection of Norotos' previous claims describing the '810 patent shell as smooth.  Norotos said Claim 22 made express what the company believed had been inherent in the previous incarnation of the patent.  The "shell" was smooth according to the specifications because it did not have any projections on which a shroud line could catch -- a trait which distinguished the '810 Patent from the prior art.  Daly Decl. Ex. J, at 15-16.  And "smooth" was limited to the shell, as opposed to the entire shroud plate being "smooth."  Id.

On May 5, 2010, Examiner Nguyen responded that the PTO was persuaded the prior art did not, in fact, anticipate or render obvious Claims 17-22 and 24.  Daly Decl. Ex. K, at 3, 12 (document #42-11).  But the examiner again rejected the remaining claims.  Id. at 3.  The PTO explained that it was granting Claim 22 because it described a device in which "the external surface is smooth with rounded edges and corners at the periphery, such that the shell has no projections on which a shroud line may catch," unlike the prior art, which had projections.  Daly Decl. Ex. K, at 12.[4]

_____

[4] Since Norotos has only asserted Claim 22 against Ops-Core, the Court will not discuss the additional prosecution history.

### G.      The Current Dispute

On February 12, 2009, Norotos filed its complaint alleging patent infringement by Ops-Core.  Compl. ¶ 9.  On June 11, 2009, Ops-Core counterclaimed seeking declaratory judgment of non-infringement and invalidity of the '810 Patent.  Countercl. ¶¶ 11 and 17 (document #9).  The parties did not request a <u>Markman</u> hearing.  <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).  On October 4, 2010, Ops-Core moved for summary judgment, and on October 25, 2010,  Norotos moved for partial summary judgment with respect to Ops-Core's infringement of Claim 22.  Def. Mot. for Summ. J., 1; Pl.'s Mem. of P. & A. in Supp. of its Mot. for Partial Summ. Adjudication of Infringement of U.S. Patent No. '810, 5 (document #40) [hereinafter "Pl. Mot. for Summ. J"].  After a hearing on the parties' cross motions for summary judgment, I took the matters under advisement.

## II.      STANDARD OF REVIEW

A grant of summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." <u>Continental Cas. Co. v. Canadian Univ. Ins. Co.</u>, 924 F.2d 370, 373 (1st Cir. 1991) (quoting Fed. R. Civ. P. 56(c)).  The court does not weigh the evidence, but instead determines whether there is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  The court must view the record in the light most favorable to the non-moving party, accepting all reasonable inferences favoring that party. <u>Continental Cas.</u>, 924 F.2d at 373.  The fact that both parties are moving for summary judgment does not affect the standard of review. <u>Id.</u>  (citing <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990)).

The patentee bears the burden of proving literal infringement by a preponderance of the evidence.   SRI Int'l v. Matushita Elec. Corp. of America, 775 F.2d 1107, 1123 (Fed. Cir. 1985).

## III.    DISCUSSION

Norotos asserts that the VAS Shroud infringes Claim 22 of the '810 Patent.  Resolution of this allegation turns on the fact that Norotos' patented shroud plate includes an insert with a lock and release mechanism on its shell, while Ops-Core's VAS Shroud contains only a shell and an insert area.  However, when Ops-Core's VAS shroud is assembled with the corresponding mount arm, which has a lock and release mechanism, it contains all the essential elements as Norotos' patented shroud plate -- a shell, an insert, and a lock and release mechanism.

A patent infringement analysis requires a two step inquiry.  Markman, 52 F.3d at 976. First, the court must construe the meaning of each asserted claim.  Id.  Second, the accused product or process must be compared to the properly construed claims to determine if it contains each limitation either literally or by a substantial equivalent.  Id.  The first step is a question of law; the second step is a question of fact.  See RF Del., Inc. v. Pac. Keystone Techs., Inc., 326 F.3d 1255, 1266 (Fed. Cir. 2003).

To resolve whether Ops-Core's VAS Shroud infringes Claim 22 of the '810 Patent, I must determine whether the Ops-Core VAS Shroud should be considered in its assembled form.  To that end, I must construe the terms of Claim 22 the '810 Patent, which reads in full:

> A shroud plate for headgear comprising a shell, an insert, a
> lock and a release mechanism, wherein the shell extends
> around at least a portion of the insert and has an external
> surface that faces away from the headgear when the shroud
> plate is attached to the headgear, a back surface that faces
> toward the headgear when the shroud plate is attached to
> the headgear and a periphery; wherein the external surface
> is smooth with rounded edges and corners at the periphery,

such that the shell has no projections on which a shroud line may catch and is shaped to match the contour of the headgear; wherein the insert is adapted to receive a lock plate; wherein the lock is adapted to secure the lock plate to the insert; and wherein the release mechanism allows for removal of the lock plate from the insert.

Daly Decl. Ex. J, at 8.

## A.     Claim Construction

"It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specifications and, if in evidence, the prosecution history."  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Claim terms should be given the full range of their ordinary meaning as understood by persons skilled in the relevant art.  See Tex. Digital Sys. v. Telegenix, Inc., 308 F.3d 1193, 1202 (Fed. Cir. 2002); see also Phillips v. AWH Corp., 415 F.3d 1303, 1312-19 (Fed. Cir. 2005) (en banc).

When reviewing a patent's specifications, the court must not read limitations into the claims unless the patentee has clearly intended to limit the scope.  See Trading Technologies Int'l, Inc. v. eSpeed, Inc., 595 F.3d 1340, 1352 (Fed. Cir. 2010).  The court cannot, however, expand or enlarge a claim through construction beyond what the patentee described in the specifications.  See Biogen, Inc. v. Berlex Labs., Inc., 318 F.3d 1132, 1140 (Fed. Cir. 2003).

Amendments to a patent made to overcome a prior art rejection can create what has been characterized as a prosecution history estoppel.  See Vitronics Corp., 90 F.3d at 1583. Prosecution history estoppel can also occur as a result of arguments made during prosecution that show a "clear and unmistakable surrender of subject matter."  Sextant Avionique, S.A. v. Analog Devices, Inc., 172 F.3d 817, 828 (Fed. Cir. 1999).

With these principles in mind, I will construe the disputed terms of Claim 22. Specifically, per the parties' request, I will construe: "shell," "insert," "a lock and a release mechanism," "shroud plate," "comprising," and "smooth."[5] These terms fall into three categories: the essential elements, how these elements must be assembled, and how to describe the product. I will address each category in turn.

### 1. Essential Structural Elements

As the parties agree, in order for a shroud plate -- to be construed in part -- to act as an interface between headgear and a helmet, it must contain a shell, an insert, and a lock and release mechanism. See, e.g., Pl. Norotos, Inc.'s Statement of Undisputed Material Facts in Supp. of its Motion for Summ. J. ¶¶ 2, 5 (document #41).

### a. "Shell"

The shell is the contoured portion of the shroud plate that attaches to the helmet. The specifications of the '810 Patent describe a possible embodiment of a shell as manufactured to fit "the contour of the helmet. . . . [and] having a smooth surface with rounded edges and corners . . . ." '810 Patent col.3 ll.3-5. Only Norotos requests the Court construe the term "shell." In support, Norotos cites Figures 1, 2, and 3 in the '810 Patent specifications to support their construction of the shell being an outer component or part of the shroud plate. '810 Patent fig. 1-3. Ops-Core does not contest this construction.[6] Therefore, based on the specifications and

---

[5] The parties have both identified and provided proposed constructions for the terms discussed, unless otherwise noted. This Court declines to construe "lock plate."

[6] If Ops-Core did not request construction of any term in Claim 22, it does not dispute the construction for the purposes of summary judgment or believes the remaining terms require no construction. Def. Ops, Inc.'s Opp'n to Pl.'s Mot. for Summ. J. 3, n.1.

figures of the '810 Patent, "shell" is construed to mean the contoured component of the shroud plate having a smooth surface with rounded edges and corners.  See '810 Patent col.3 ll.3-5.

### b.    "Insert"

The '810 Patent specifications describe an "insert" as "a bay for a lock plate or adapter plate . . . and functions as the interface between a helmet mount and a helmet."  '810 Patent col.3 ll.18-20.  There is no discernable difference in how the two parties interpret these specifications.  Indeed, both Norotos and Ops-Core describe an insert as the area where a lock plate on a mount arm snaps into the shell.[7]  Accordingly, I will construe the term consistent with the specifications as: a bay for a lock plate or adapter plate, which functions as the interface between a helmet mount and a helmet.  See '810 Patent col.3 ll.18-20.

### c.    "Lock and Release Mechanism"

The lock is the component that secures the mount arm to the shroud plate and, working with the release mechanism, allows the user to disengage the mount arm from the shroud plate.  '810 Patent col.4 ll.12-18; col.4 ll.36-39.  As the patent describes, the "the sides of the lock may be tapered into a dovetail shape in order to secure the lock to the insert at the opening in the side wall."  Id. col.3 ll.37-39.  The lock "may be connected to a link plate by a rivet, bolt, screw or any other appropriate means of attachment."  Id. col.3 ll.51-53.  In order to "introduce the lock plate to the insert, the user may press the lock plate against the lock, forcing the lock to displace enough to allow the lock plate to become flush with the insert, a snap-lock action."  Id. col.4 ll.14-18.  "Springs will then cause the lock and release button to return to their original position,

---

[7] Norotos proposes that insert be construed as "an inner component or part of the shroud plate" that is adapted to receive a lock plate, based on the '810 Patent specifications and figures.  Pl. Mot. for Summ. J., 7.  Ops-Core suggests a "part or component of a shroud plate that permits insertion of a lock plate" and cites to the '810 Patent specifications.  Def. Ops, Inc.'s Opp'n to Pl.'s Mot. for Summ. J., 5 (document #49).

-13-

with the ledge of the lock securing the lock plate to the insert." Id. col.4 ll.29-33. Finally, in order to release the mount arm, "the user may depress and hold the release button." Id. col.4 l.37.

Both parties agree on the mechanics and the function of a lock and a release mechanism in securing the mount arm to the shroud plate. Springs or spring-like components allow the lock to slide into the insert area and hold the mount arm in place, while the release mechanism retracts the lock and disengages the mount arm. '810 Patent col.4 ll.30-32. Where the parties differ, however, is whether the '810 Patent requires that the lock and the release mechanism be located on the shell. Their disagreement stems from the claim language describing "shroud plate . . . comprising a shell, an insert, a lock and a release mechanism." Daly Decl. Ex. J, at 8. Based on this language, Ops-Core claims the lock and the release mechanism must be located on the shell along with the insert, while Norotos asserts that the lock and release mechanism can be either on the shell or on the mount arm. I agree with Norotos.

The '810 Patent describes only a preferred embodiment of the device, noting that "various embodiments of this invention have been shown and described," and that "[i]t is, therefore, to be understood that within the scope of the appended claims, this invention may be practiced otherwise than as specifically described." '810 Patent col.4 ll.55-61. It is only when illustrating the preferred embodiment -- as depicted in FIG. 3 attached to the patent -- that the '810 Patent describes a release button "centrally located at the bottom of the shell." Id. col.4 ll.40-44. Indeed, the '810 Patent explicitly acknowledges that "alternate arrangements of the lock and release button are possible." Id. col.4 ll.52-53. "For instance, the release button may be located

adjacent to the lock."  Id.  This unambiguous language makes clear that the patentee did not intend the lock and release button to be located on specific areas of the shell.[8]

Furthermore, in construing the lock and the release mechanism, I am guided by the rule that courts shall not read any limitations into the claims not otherwise included.  Trading Technologies Int'l, 595 F.3d at 1352.  Thus, I cannot read into the patent specifications any construction that requires the lock and release mechanism to be in a particular location.  As such, "a lock and a release mechanism" is construed simply as a mechanism comprising a lock, link plate, and a release button -- with structures as described in the '810 Patents' specifications -- whose function is to secure a mount arm to a shroud plate.

## 2. Assembly

With the essential elements of the device in mind, I will now construe the two terms that appear in Claim 22's phrase "shroud plate comprising."  Such a construction of the terms "shroud plate" and "comprising" requires me to determine whether the essential elements must be on a single structure -- meaning the insert, the lock and the release mechanism are all located on the shell -- or whether I can consider an assembled device -- meaning that the lock and release mechanism can be located on the end of the mount arm that snaps into the shell's insert.  In other words, must "shroud plate" be construed as a single structure, or can it be an assembly of two or more components?  For the reasons described below, I find that the device can be considered in its assembled form.

_____

[8] Ops-Core argues that Norotos depicts a lock and a release mechanism located on the shell in every figure of the '810 Patent.  "The mere fact that the patent drawings depict a particular embodiment of the patent does not operate to limit the claims to that specific configuration."  Anchor Wall Sys. v. Rockwood Retaining Walls, Inc., 340 F.3d 1298, 1306-07 (Fed. Cir. 2003).  Therefore, the '810 Patent claim language cannot be limited by the figures simply by pointing to an illustration of a lock and a release mechanism on the shell when the actual specifications decline to claim the lock and the release mechanism must be located on the shell.

### a.    "Shroud Plate"

Both parties agree that a shroud plate is a device that acts as an interface between a helmet and headgear, such as night vision goggles.  And both agree that the shroud plate is made up of a shell, an insert, and a lock and release mechanism.  Ops-Core believes that the '810 "shroud plate" must be a unitary structure in which all of the essential elements are on the shell.  Conversely, Norotos asserts that the '810 Patent's terms "shroud plate" encompasses the combination of these essential elements, regardless of whether they are on a unitary structure or an assembled structure constructed by the combination of a shell with a mount arm.  Specifically, Norotos is requesting that the phrase,"a shroud plate," be construed as "an attachment mechanism that allows a headgear, such as a helmet, and a mount to interact in such a way as to support a night vision device."  Pl. Mot. for Summ. J., 6.  Norotos further argues that "shroud plate" should be interpreted as encompassing either a single structure or an assembly of pieces and support this construction with the specifications in the '810 Patent.  Opp'n to Def.'s Mot. for Summ. J. and Sanctions, 7 (document #38).

Conversely, Ops-Core proposes that "shroud plate" be interpreted as "a comparatively flat structure, thinner than it is wide or long, that may be composed of one or more integrally related pieces, but that does not include an arm-shaped structure."  Def. Ops, Inc.'s Opp'n to Pl.'s Mot. for Summ. J., 3-4.  In sum, Norotos requests an expansive construction that allows the shroud plate to be considered in its assembled form, while Ops-Core is asking the court to limit the construction of shroud plate to the plain meaning of "plate," which would be a flat structure that excludes any mount arm.

To resolve this dispute, I will consider both the patent language and the prosecution history, relying most heavily on the claim language.  See Vitronics Corp., 90 F.3d at 1582 ("Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.").

### (1)    Specifications

Three canons of claim construction guide my interpretation of the term "shroud plate" based on the language of the '810 Patent.  First, "if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."  Phillips, 415 F.3d at 1323.  Second, "the mere depiction of a structural claim feature as unitary in an embodiment, without more, does not mandate that the structural limitation be unitary."  Cross Med. Prod., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1309 (Fed. Cir. 2005).  Finally, courts may not read into a claim a limitation that is not expressly there.  See, e.g., Abbott Labs. v. Sandoz, Inc., 566 F.3d 1282, 1288 (Fed. Cir. 2009) (en banc) (noting that courts should "not limit broader claim language to [a] single application unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction.").

Here, the '810 Patent's specifications anticipate various assemblies of the shroud plate. For instance, the patent says "the shroud plate *may* comprise an insert that is integral with the shell, essentially making the plate one piece."  '810 Patent col.3 ll.20-22 (emphasis added) (internal notations omitted).  In addition, the patent notes that "[t]he shroud plate *may* comprise two integrally related pieces, the shell and the insert, to optimize weight and durability."  Id. col.3 ll.22-24 (emphasis added) (internal notations omitted).

To be sure, the '810 Patent depicts a shroud plate wherein the lock and release mechanism, insert, and shell are a unitary structure. See Cross Med. Prod., 424 F.3d at 1309. And, it does not explicitly describe a shroud plate in which a mount arm contributes the lock and release mechanism. However, as illustrated by the patent's use of the word "may," it also does not limit a shroud plate to a unitary structure. As such, this Court is prohibited from reading such a limitation into the '810 Patent. See Abbott Labs., 566 F.3d at 1288.

### (2)  Prosecution History

Construing "shroud plate" as encompassing assembled devices comports with the prosecution history of the '810 patent. See Vitronics Corp., 90 F.3d at 1583 (noting that the patent holder cannot alter the meaning of the claims in litigation and "the same holds true whether it is the patentee or the alleged infringer who seeks to alter the scope of the claims").

Ops-Core argued to the PTO that the prior art -- the helmet mounting bracket -- should be considered in its assembled form when comparing it to the '810 Patent's shroud plate. Specifically, Ops-Core noted that when the helmet mounting bracket was combined with a mount arm, the mount effectively became part of the shroud plate, thereby rendering a device with all the essential elements.[9] Daly Decl. Ex. F, at 10. Norotos agreed that persons of ordinary

---

[9] Specifically, Ops-Core argued in the Request for Reexamination that "[a] removable element, such as Night Vision Goggles, includes a male portion which matches a female portion mounted on the helmet." Daly Decl. Ex. F, at 10. Ops-Core further said:

> Pressing a release button moves the latch against a spring and allows the two parts to be separated. In the case of the '810 Patent and the latch and release mechanism are located on the female element, whereas they are on the male element in the [prior art]. Such placement of the latch and release mechanism does not militate against anticipation since once the male and female portions are engaged, the latch and release effectively become part of the claimed shroud plate, . . .

Daly Decl. Ex. F, at 10.

skill in the art would find it entirely logical that the pieces would form an assembly, since the lock and the release mechanism serve a purpose only when combined with the shell and insert. Opp'n to Def.'s Mot. for Summ. J. and Sanctions, 5.

During Reexamination, Norotos had the option of distinguishing its shroud plate from the prior art by requiring all the essential elements -- shell, insert, lock and release mechanism -- to be located on a unitary structure. It did not pursue this option. Rather, Norotos argued to the PTO that the distinction between the '810 shroud plate and prior art was that the '810 Patent described a shroud plate that was smooth with rounded edges, a distinction which the PTO accepted. By not objecting to Ops-Core's request that the PTO consider the prior art as an assembly with the mount arm, Norotos implicitly agreed that a shroud plate can be considered in an assembled form. The concept that a shroud plate can be considered an assembly of parts is now part of the prosecution history, and as such both parties, including Ops-Core, are estopped from claiming otherwise. See Vitronics Corp., 90 F.3d at 1583.

In sum, the '810 Patent uses broad claim language that describes a shroud plate's function and essential elements without limiting the structure and components of the device. Considering the broad claim language in conjunction with the prosecution history, this Court declines to limit the language to find any requirement that the shroud plate must be a unitary structure and, instead, allows a construction that includes an assembly with a mount arm. As such, "shroud plate" is construed as an interface that be can be either a unitary structure or an assembled device, which attaches headgear -- such as a helmet -- to a night vision device mounted on an arm.

### b.    "Comprising"

Ops-Core requests a separate construction of the word "comprising" and asserts that Norotos' use of the term "comprising" means the shroud plate must be a unitary structure.  Def. Ops, Inc.'s Opp'n to Pl.'s Mot. for Summ. J. 5.  According to Ops-Core, the term "comprising" signifies that a device is not a shroud plate if it must be assembled with another piece, like a mount arm, in order to contain all the essential elements.  Again, I disagree.

"Comprising is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."  <u>Genentech, Inc. v. Chiron Corp.</u>, 112 F.3d 495, 501 (Fed. Cir. 1997); <u>see also</u> <u>Carl Zeiss Stiftung v. Renishaw PLC</u>, 945 F.2d 1173, 1178 (Fed. Cir. 1991) ("[a patent claim] which uses the term 'comprising,' is an 'open' claim which will read on devices . . . .").  In other words, "comprise" simply meant *that* a device must include essential element, not *how* the device includes them.

Again, the '810 Patent specifications do not clearly require that the essential elements be located on the shell, thereby rendering the shroud plate a unitary structure.  This Court will not read into the claims any meanings that are not given by the specifications.  <u>See</u> <u>Trading Technologies Intern,</u> 595 F.3d at 1352.   Thus, the term "comprising" is construed as "including," but not requiring any of the essential elements to be on a unitary structure.

### 3.    Description:  "Smooth"

The '810 Patent specifications state that "the top surface of the shell may be smooth . . . ." and "[f]itting the shell to the shape of the helmet and having a smooth surface . . . ."  '810 Patent col.3 ll.2-5.  In addition, Claim 22 states "[w]herein the external surface is smooth with rounded

edges and corners at the periphery, such that the shell has no projections . . . ."  Daly Decl. Ex. J, at 8.

The parties do not contest that "smooth" should be construed to having its ordinary meaning.  The parties disagree, however, about what exactly must be smooth.  Norotos requests "smooth" be applied only to the shell, based on both the specifications and the prosecution history of Claim 22.  Ops-Core proposes that "smooth" describes the entire "external surface" of the shroud plate, meaning that a device is not a smooth shroud plate if, when combined with a mount arm, it has "sharp edges or projections."  Def. Ops Core, Inc.'s Opp'n to Pl.'s Mot. for Summ. J., 3.

Based on the prosecution history, I agree with Norotos.  During the Reexamination, the PTO found that Claim 22 was not anticipated by the prior art because the shell described in '810 Patent had a "smooth" surface, while the helmet mounting bracket had projections -- not including the mount arm -- on which a shroud line may catch.  Daly Decl. Ex. K, at 12; <u>see</u> <u>also</u> Opp'n to Def.'s Mot. for Summ. J. and Sanctions, 16.  In other words, the PTO allowed Claim 22 because Norotos specified that "smooth" means the shell does not have any projections on which a shroud line may catch.  Therefore, "smooth" is construed as referring to only the shell.

### B.    Literal Infringement

Now I must determine whether Ops-Core's VAS Shroud literally infringes on the '810 Patent in violation of 35 U.S.C. § 271.  Generally, a claim is literally infringed only if each properly construed claim element reads on the accused product or process.  <u>See</u> <u>Cortland Line Co.  v. Orvis Co.</u>, 203 F.3d 1351, 1358 (Fed. Cir. 2000); <u>Atl. Thermoplastics Co. v. Faytex Corp.</u>, 970 F.2d 834, 837 (Fed. Cir. 1992).  Although the question of infringement is typically a

factual one for a jury, where the relevant material facts are not genuinely in dispute, the question of literal infringement may be one that, as a practical matter, "collapses to one of claim construction and is thus amenable to summary judgment." <u>Athletic Alt., Inc. v. Prince Mfg., Inc.</u>, 73 F.3d 1573, 1578 (Fed. Cir. 1996).

Here, the following material facts are not in dispute:  The VAS Shroud has a shell that is smooth, as Ops-Core advertises this very feature on its packaging.  The VAS Shroud contains an insert, as the term has been construed.  The mount arm with which the VAS Shroud is displayed at trade shows and in promotional material has a lock and release mechanism on the end of the mount arm that snaps into the VAS Shroud's insert.  Finally, the lock and release mechanism on the mount arm used in conjunction with the VAS Shroud has no purpose other than to snap into an insert like the one on the VAS Shroud.

When the VAS Shroud is assembled with a mount arm, it comprises the limitations of Claim 22 -- a smooth shell, an insert, a lock and a release mechanism -- and it literally infringes on Claim 22 of the '810 patent.[10]  In other words, the VAS Shroud is a shroud plate comprising all of the essential elements of Claim 22.  Therefore, Ops-Core's VAS Shroud literally infringes Claim 22 of Norotos' '810 Patent.

### C.    Sanctions

Ops-Core also moves for sanctions against Norotos under 35 U.S.C. § 285, pursuant to which, "in exceptional cases, the court may award reasonable attorney fees to the prevailing party."  Here, Norotos, not Ops-Core, is the prevailing party.  However, even if Ops-Core were the prevailing party, absent misconduct in conduct of the litigation or in securing the patent,

---

[10] Norotos also proposed infringement under the doctrine of equivalents. Given this Court's finding of literal infringement, the issue is moot.

sanctions could be imposed against Norotos only if both (1) the litigation had been brought in subjective bad faith, and (2) the litigation were objectively baseless.  See Forest Lab., Inc. v Abbott Labs., 339 F.3d 1324, 1329-31 (Fed.  Cir.  2003).  In this case, Norotos did not engage in misconduct during the litigation or bring the lawsuit in bad faith.  Nor was their litigation objectively baseless.  Accordingly, sanctions against Norotos are not warranted.

## IV.    CONCLUSION

For the foregoing reasons, Norotos' Motion for Partial Summary Judgment (**document #39**) is **GRANTED**, and Ops-Core's Motion for Summary Judgment (**document #34**) and Motion for Sanctions (**document #55**) are **DENIED**.


**SO ORDERED.**

**Date:  July 25, 2011**          _____/s/ Nancy Gertner_____
                                       **NANCY GERTNER, U.S.D.J.**